## The Tinicum Fishing Co. *versus* Carter.

1. A fishery is an incorporeal easement on the land of the riparian owner, like a way or common.
2. The right of fishery exists only during the fishing season.
3. A fishery on the Delaware was within the limits of the port of Philadelphia.  The riparian owner under a license from the wardens built a pier on their land which interrupted the fishery.  *Held*, that this was *damnum absque injuriâ* and the owners of the fishery could not recover from the riparian owner.
4. The bed and channel of the Delaware *ad medium aquæ filum* belong respectively to Pennsylvania and New Jersey.
5. The title of the riparian owner extends to low-water mark, not absolutely in tidal streams, but subject to the public right of passage when the tide is high.
6. The riparian owner has no right to make any erection between high and low water mark without express authority from the state.
7. The state can grant authority to make such erection either to the riparian owner or to others so long as the riparian owner is not thereby deprived of access to the river and use of it as a public highway.
8. Under this restriction the right of the Commonwealth to make any erections in the river for the improvement of its use as a public highway or to promote in any way the business and prosperity of the people is undoubted and unlimited.

[Tinicum Fishing Co. *v.* Carter.]

9. Those who have shore or fishery rights took and hold them subject to this necessary transcendental power.

10. The constitutional provision as to compensation for private property taken for public use does not apply to mere consequential damages.

11. It is no objection to the license by the state to make erections in the river, that it was obtained on application of the owner for his advantage to increase the value of his land.

12. This is always the case in regard to such works whether projected by individuals or corporations.

13. An erection thus made by a riparian owner is not part of his domain absolutely. Beyond low-water mark the title of the structure follows that of the bed on which it is built, and remains in the state subject to the public right of passage and access to the river and between high and low water.

14. There is no covenant or duty which the riparian owner owes to his grantees not to avail himself of a privilege to make such erections or to accept such a license from the state.

15. Independently of the Acts of February 8th 1804 and February 23d 1809, there is no exclusive right of fishery by the riparian owner opposite his shore in any navigable river.

16. An arm of the sea extends as far into the interior of a country as the water of rivers is propelled backward by the tide.

17. In Pennsylvania there can be no prescription of a several and exclusive fishery.

18. Prescription cannot have a legal origin where no grant could have been made to support it.

19. The respective grants to the proprietaries of Pennsylvania and New Jersey were to low-water mark, neither ever owned the bed of the Delaware river.

20. The bed of the river and the river itself passed by force of the revolution, &c., to the two states, to be owned and enjoyed on the same principle as a navigable river flowing between two conterminous nations.

21. These states may by compact and laws regulate and restrain the common right of fishing to any part of the shore.

22. A person can establish no exclusive right of fishery on the Delaware without proving a compliance with the Acts of 1804 and 1809.

23. A fishing-place may be granted separate from the soil.

24. There may be a grant of an easement in gross personal to the grantee, but it cannot be assigned or transmitted by descent; nor can the owner of the right take another person into company with him.

25. If the easement consists in a right of profit *a prendre*, if granted to one in gross, it is treated as an estate and may therefore be for life or inheritance.

26. If the right be an easement proper, as a right of way and is granted in gross, it is a mere personal interest and not inheritable.

27. A right to take fish is a profit *a prendre* in another's soil, and requires for its use exclusive occupancy during the period of fishing, and implies the right to fix stakes, &c., for drawing the seine and the occupancy of the bank at high tide as well as the space between high and low water mark.

28. The grantee of a fishery has the exclusive possession during his fishing time, and the grantor at all other times and for all purposes.

29. Land or an interest in land cannot be prescribed for.

30. A presumption of knowledge and acquiescence of the owner that the exercise is under a claim of a right, is required in cases of prescription.

31. It is not a principle without exception that whatever incorporeal hereditament may be granted, may also be acquired by long and uninterrupted user.

32. A right claimed by prescription must be such as must reasonably be presumed to have been granted, not one whose exercise would destroy the usufruct of the grantor's property.

[Tinicum Fishing Co. *v.* Carter.]

January 19th 1869.   Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ.   WILLIAMS, J., at Nisi Prius.

Error to the Court of Common Pleas of *Delaware county :* No. 106, to January Term 1869.

This was an action on the case commenced July 26th 1867, by Paul B. Carter against The Tinicum Fishing Company, for disturbing a right of fishery on the Delaware river, in Tinicum township, Delaware county, to twelve-fourteenths of which the plaintiff claimed that he had title.

On the trial before Butler, P. J., it was admitted that the defendants were incorporated April 1st 1863, and that they own the land in front of the fishery.   The plaintiff gave in evidence the will of Christopher Taylor, proved December 24th 1768, giving "his fishing-place" to David Sanderlin and to his heirs for ever.

He gave other evidence, as follows :—

Abraham Carter testified : "I have known the fishery forty-five years.   Joseph Carter had possession of it when I first knew it ; he occupied it till his death about 1830.   After his death two of his sons, Joseph Carter and Daniel, occupied it.   Then William Carter and Daniel took it after Joseph's death.   The sons occupied until 1833 or 1834.   It remained in the hands of the Carters after their death.   They fished from Hart's wharf to mouth of Darby creek, well on to a mile.   Fished out into the river some four or five hundred fathoms long.   They drew out down about the mouth of Darby creek on ebb tide ; on flood tide they started near Darby creek and drew out some two hundred yards below Hart's wharf.   They drew the net out in the water.   They operated on the shore in fishing.   It was necessary in fishing to use the fast land.   There were no obstructions at that time. While Daniel was there I was there almost every day ; this continued for near twelve years ; the last season I was there was in 1828 ; from 1816 during that period they had a field they used to dry their nets in ; after fishing they used to take their nets out to dry them ; I am nephew of old Joseph Carter.   They had a capstan on the land between the high and low water ; I think it would be just at high-water mark ; it was on the fast land ; this capstan was used the last two or three years ; the capstan was about Hart's lane."

Edward Carter testified : "I was born in 1777 ; when I first recollect, my father had and used this fishery ; my father was Joseph, my uncle was Daniel ; they used it week about ; I recollect their fishing it sixty-nine or seventy years ago ; they fished some years ; my father last fished it ; my brothers Daniel and Joseph fished it ; I was there once in a while ; the fishing-place was between Hart's wharf and Darby creek ; it was near a mile ; they drew their net out near Hart's wharf at high water and

[Tinicum Fishing Co. *v.* Carter.]

down at the creek at low water; they pretty much always drew their nets out at one place at high water; they walked along on the fast land; until they pulled their nets in, then they went into the water; wharves erected below Hart's wharf would break up the fishery; Wm. Cornelius occupied it before father's death; he was a tenant of father's; think brother William got it after father's death; we occupied it as long as he lived; never knew any one else but my grandfather's family to own it."

Albert Eggleton testified: "I fished the Carter fishery below the Lazaretto, in 1851 and 1852, and undertook it in 1853; I made a regular lease with Paul B. Carter; I knew the fishery before I leased it, when I was fifteen; I am now fifty-two years old; about thirty-four years ago I fished with Mr. Moser; he fished it some two or three years; I was there about the last year; we started to fish above Lazaretto wharf and fished down to the mouth of Darby creek on river Delaware; Moser fished over same ground. We started below Hart's wharf and carried out a water line above the wharf; we fished down to Darby creek on ebb tide; on flood tide we fished from Darby creek to about one hundred yards below Hart's wharf, where we had a capstan; at high water we occupied all the shore in fishing from Hart's wharf down below George Horne's house; we used some four or five hundred yards of the shore; the cabin was below the fishing company's present house; we could not fish with any obstructions in the way or on the shore; we could not fish with any obstruction at high-water mark on shore.

"I have seen the walls, piers and improvements of the defendants; they could not fish there with them on the ebb tide; at high water an ebb tide would swing down on that pier; I noticed some four or five piers erected out opposite their pleasure-house; they ran from high water to below low-water mark, about two hundred yards from the banks out; I don't think they could walk outside of them at low water; boats can land at the piers at low water; they are stationary piers, made of wharf timber; I would not give anything to rent that fishery with those piers there.

"I saw the stone wall; it is a stone wall commencing on the upper part and runs down below where the old fishing cabin was, about one hundred yards long up and down the stream; it is not in the way of lining out the nets; it would be considered an encumbrance on fishing-ground; I can't say it is; it is outside of high-water mark; it is three or four feet high; sometimes we drew our nets out where the wall is; we might still but with difficulty; could not fish near as well as without the wall there. George Poat fished one season there in 1854 or 1855, after I gave it up; I quit in 1853; first year I paid $150 or $200; second year I paid $200; third year I did not fish it; they burnt me

[Tinicum Fishing Co. *v.* Carter.]

out, so I left; I would have given $200 a year rent for it as it was when I was there; I would give as much now if the obstructions were away; would not have it at any price with the obstructions there; Mr. Carter had the right to rent it also for cat fishing; worth about $50 a year for that; they lined out above Hart's wharf and took out on Darby creek; the obstructions would I suppose damage this fishing; the capstan was put up on solid ground near the fence above high water; the men walked around; the capstan was a necessary and important item in fishing; bridge work connects the piers together."

William Hill testified: "I fished it thirty or forty years since; the fishery might have been fished with the wall but not with the piers there."

The plaintiff gave further evidence, including leases from the Carters of the fishing right, for the purpose of proving the use of the fishery by himself and those under whom he claimed: and also the interruption of the right by the defendants in building the piers, wall, &c.

He then offered in evidence the will of Joseph Carter, dated July 16th 1828, proved February 6th 1830, devising the fishing-right to Joseph Carter, Jr., and Cloud Carter. The defendants objected to the offer on the ground that no title had been shown in the testator. The evidence was admitted, and a bill of exceptions sealed for the defendants. Also deed of August 13th 1832, from Cloud Carter for his share of the fishery to William Carter: and other evidence showing twelve-fourteenths of the title of Joseph Carter, Sr., in the plaintiff.

The defendants gave evidence for the purpose of showing that the fishery had been obstructed and abandoned long before their incorporation; that few fish could now be caught there, that it was filled up with mud, reeds, &c., long before the piers were built; that the refuse from the Philadelphia Gas-Works drives the fish from that shore, that fishing there would not pay expenses, and that the fishery was of no value.

They also gave in evidence two licenses from the Wardens of Philadelphia, one dated September the 20th 1864, authorizing them "to construct a pier twenty-five by thirty feet into the river Delaware, opposite their property in Delaware county, in accordance with the plan submitted and on file in this office. The materials and construction of said pier to be approved by the wardens, and three days' notice to be given in writing to the officers of the board previous to the sinking of the same:" the other dated April 3d 1866, authorizing them "to build into the Delaware river, in front of their property, in Delaware county, ten cribs or less, of ten feet square, with spans of forty-five feet clear, connecting with the present pier, as per plan submitted, and application,

[Tinicum Fishing Co. *v.* Carter.]

subject to the laws of the state of Pennsylvania, and the authorities of Delaware county."

They submitted the following points:—

1. To enable the plaintiff to recover he must show a good title to the easement in question and to acquire such title by use, the use must be continuous, adverse and uninterrupted for at least twenty-one years.

2. The port wardens of the port of Philadelphia having given the defendants authority to erect the piers complained of, the defendants are protected by such authority, and are not liable in this action.

3. The plaintiff has not shown sufficient evidence of title to the fishery in question to enable him to recover in this case.

4. Under all the evidence in this case the verdict must be for the defendants.

5. If the jury believe that the plaintiff had wholly abandoned the fishery in question before the erection of the pier complained of, the plaintiff is not entitled to recover in this action.

6. If the jury believe that the right of fishing claimed in this action is of no value whatever, the plaintiff is not entitled to recover.

The court disaffirmed the 2d and 4th points and charged:—

" Has the plaintiff shown title to the fishery in question?

" His claim is by virtue of long-continued possession, or use. Title to such property may be so acquired. Twenty-one years' uninterrupted, adverse and continuous use of the privilege of fishing, at a particular point on the river, will confer the title to such an easement. And where the privilege is exercised under a claim of right (or as if it were the right of the party so exercising it), the use is adverse.

" Then has the plaintiff, or those under whom he holds, exercised the privilege of fishing at the point in question for twenty-one years, uninterruptedly, under a claim of right (or as if it was their right), to do so? It is not necessary that the plaintiff should show that *he* has so long had the possession, or use, or that any *one* of those under whom he claims had. It is sufficient if it appear that all of them together—he and they, taking their several possessions—had it and used it in the manner described—adversely, continuously and uninterruptedly, for twenty-one years.

" The oldest witness called and examined to this point was Edward Carter. He says he remembers the fishery for sixty to seventy years; that at his first recollection it was in the occupation of Joseph Carter, Sr., and the witness's uncle Daniel; that afterwards Joseph fished it alone: and then one Cornelius fished it under a lease from Joseph; that after this, Joseph Carter, Jr., and Daniel Carter, sons of Joseph Carter, Sr., fished it for a time before their father's death. When this individual Joseph Carter,

[Tinicum Fishing Co. *v.* Carter.]

Sr., died, does not precisely appear. His will was proved in 1830, and it is probable that his death occurred shortly before. Two witnesses say it occurred about this date. By his will he devised the fishery (or whatever interest he may have had in it), to his two sons Joseph and Cloud. In 1832 Cloud sold his interest to his brother William, and in 1846 the interest of William was sold to the plaintiff in this suit, by the sheriff, on an execution. Joseph, Jr. (to whom we have seen one-half was devised), died without descendants, leaving six brothers and one sister, to whom his interest descended. Five of these brothers conveyed their shares (being of course five-sevenths of one-half) to the plaintiff. He thus became possessed of twelve-fourteenths of the whole; provided those through whom he claims had title to convey.

"I now repeat, Joseph Carter, Sr., occupied and used the fishery, according to the evidence, sixty to seventy years ago; and after his death it passed into the possession and use, first, of Joseph Carter, Jr., and his brother Daniel; and then for a time of William and Daniel; was afterwards leased from them; and since the conveyances to the plaintiff, before spoken of, was for several years leased by him. It was last fished for shad, under such lease, in 1858. The statement of Abraham Carter corresponds with that of Edward, as to the occupation or use of the fishery, though his recollection does not extend so far back.

"You will determine from the evidence, whether the plaintiff and those under whom he claims, were, together, in the continuous, uninterrupted, adverse use of the fishery for twenty-one years, prior to the time of the defendants' interference with it, in 1864. If they were, he has a title to the right, and must be protected in the enjoyment of it. If they were not, he has no title, and cannot recover in this suit. I have said if they were so in possession and enjoyment of the fishery for such a length of time, he has title. This, however, must be qualified by adding, *if he has not lost it since.* Such a title may be lost by abandonment. [But the simple *omission to exercise the privilege* for a period *short of twenty-one years,* is not an abandonment. We have seen that the fishery was used under a lease from the plaintiff so late as 1858. Is there any evidence of abandonment other than the omission of the right to fish? If there is, you will consider it in connection with such omission. And you will judge whether the omission to fish arose from a purpose to *abandon the right,* or from interference by persons occupying the shore. If the plaintiff wholly abandoned the fishery—that is, voluntarily withdrew from it—and the defendant afterwards made improvements and expended money there, he cannot now complain. But we repeat, is there any evidence in the cause of such *abandonment,* other than the inference that might arise from non-usage of the right?] If *not,* an abandonment can-

[Tinicum Fishing Co. *v.* Carter.]

not be found, unless indeed the non-usage *has continued for twenty-one years*, which the defendant does not seem to allege.

"The defendants ask us to instruct you that even if the plaintiff acquired the title by his purchase and occupation, and has not lost it by abandonment, still 'if the jury believes the right of fishing is of no value whatever, the plaintiff is not entitled to recover.' This, in terms, may be true. [For instance, if the river had ceased to flow and its bed become dry land at the point in question, so that the exercise of the right of fishing had become impossible; or if from some cause fish had ceased to exist in the river, and could not hereafter live there, then the right to the privilege of fishing would be 'of no value,' and the right itself terminate. But so long as the river continues to flow, and fish may be caught in its waters on this shore, the privilege of fishing is, in legal contemplation, *of value*, and must be protected against encroachment, whether the business of fishing be *profitable* or not.] If one have a private way through his neighbor's land, which is rendered useless by the opening of a more convenient public road, he is still entitled to have it protected against obstruction; he *may* travel it if he sees fit—it is his *property*, and has value in law.

"If then you find the plaintiff to have title to the fishery, the next question will be, has the defendant interfered with it? He has erected piers in the river in such manner, according to the testimony, as to obstruct seriously the fishing on this shore. If this is true, and the plaintiff had title at the time of the interference, he should recover. And this will bring you to the question of damages. If entitled to recover, the plaintiff should receive such a sum as will compensate him for his loss. The first pier was erected in 1864; the wall along the bank was built earlier; but the company sued was not created till 1863, and you cannot go back of that time. You will remember the evidence bearing on this question. On the side of the defendants several witnesses testified that the fishery was worthless—would produce nothing. [On the other hand, a number of witnesses testified that it was worth about $250 a year, and that it actually rented for this sum.] You will determine who of these witnesses are entitled to most credit, and what the value of the fishery for the time of the interference actually was to the plaintiff. If you find in his favor, you will endeavor to give him a sum equal to his loss and no more; bearing in mind that to two-fourteenths of the property he had no pretence of title, and no claim whatever to damages."

The jury found for the plaintiff for $1217.18.

A motion for a new trial was made and on the argument the plaintiff agreed to release the verdict except $800, for which sum judgment was entered.

The defendants took a writ of error, and assigned the following errors :—

[Tinicum Fishing Co. *v.* Carter.]

1. The admission of the will of Joseph Carter.

2. Disaffirming the defendants' 2d and 4th points.

3. Disaffirming the defendants' 4th point, and submitting to the jury the question whether the possession and use of plaintiff and those under whom he claims, had been adverse, continuous and uninterrupted for twenty-one years.

4, 5 and 6. The portions of the charge included in brackets.

6. Stating to the jury that " a number of witnesses testified that it was worth $250 a year, and that it actually rented for this sum."

7. Collecting and recapitulating all t̠ʰ̱ evidence in the case that seemed to favor plaintiff's claim, and not collecting and recapitulating the evidence bearing on the side of defendants, upon which defendants relied to show want of title and abandonment.

8. The charge was calculated to lessen the weight of defendant's testimony, and give undue weight to that of plaintiff.

*W. Ward* and *W. McVeagh* (with whom was *C. Gilpin*), for plaintiffs in error.—Title to an easement must be by long, honest, peaceable user and without lawful interruption : 2 Bouvier's L. Dict. 371 ; Lacy *v.* Amett, 9 Casey 169.   The right of fishing does not justify erections on the shore : 4 Bacon's Abr. 535.   As to abandonment and interruption, they cited Whitcomb *v.* Hoyt, 6 Casey 403 ; Grant *v.* Allison, 7 Wright 431 ; Effinger *v.* Lewis, 8 Casey 367, s. c. 6 Id. 281.   As to justification under the warden's license, Act of Congress, March 2d 1799, § 8, Purd. Dig. 737, pl. 10 ; Acts of Assembly, March 29th 1803, § 13 ; February 8th 1804, § 4, 4 Sm. L. 70, 119 ; February 7th 1818, § 1, 7 Sm. L. 34 ; March 31st 1864, § 1, Pamph. L. 304 ; September 20th 1783, 4 Dallas's Acts of Assembly 142 ; Shrunk *v.* Schuylkill Nav. Co., 14 S. & R. 71.

*W. Darlington*, for defendant in error.

The opinion of the court was delivered, February 15th 1869, by

SHARSWOOD, J.—The plaintiff below claimed to be the owner of twelve-fourteenths of a fishery on the river Delaware.   It con sisted in the right, during the fishing season, to throw out nets from Hart's wharf to Darby creek, about a mile in extent, and to draw them in on the shore.   It is an incorporeal easement on the land of the riparian owner, like a way or common : Hart *v.* Hill, 1 Whart. 138.   As such an easement may arise by express grant, it may possibly be that the presumption of a grant may be made from such long-continued, open, peaceable and adverse enjoyment as will be sufficient in the case of other incorporeal hereditaments. Of this, however, we express no opinion, as there is one circumstance which makes a marked difference between this and other cases.   The right only exists during the fishing season, and not

at any other period. No such point, however, seems to have been made below, and on the assumption that such a presumption may exist, the plaintiff's case was submitted to the jury, and the verdict was in his favor. We see no error in the record, except in the answers of the court to the 2d and 4th points of the defendants, which form the ground of the 2d assignment of error.

The injury complained of arose from an obstruction caused by a wharf or pier extended and built by the defendants below into the bed of the river, by a license or authority derived from the board of wardens of the port of Philadelphia, under the 13th section of the Act of March 29th 1803, 4 Sm. Laws 70, entitled "An act to establish a board of wardens for the port of Philadelphia, and for the regulation of pilots and pilotage and for other purposes." One great object of this law was, under suitable regulations, to improve the navigation of the river, or, perhaps, rather to make its navigability available for business purposes by the building of wharves and the creation of docks, so that vessels could safely and conveniently load and unload. For this purpose the board is empowered to grant licenses to the owners of land fronting on the river to extend wharves and piers into the bed and channel, so, however, as not to injure the navigation.

The bed and channel of the Delaware river *ad medium aquæ filum* belong respectively to the states of New Jersey and Pennsylvania. The grants both to the proprietaries of the former and to William Penn, were bounded on each side by the river: Bennett *v.* Boggs, Baldw. 72. The bed and channel remained in the British crown, but by the revolution and the acknowledgment of the independence of the colonies by the treaty of peace, all the rights and sovereignty of the crown were transferred to and vested in the several states. The Delaware being a navigable co-terminous stream between New Jersey and Pennsylvania, the title of each to the bed extended from their respective shores to the middle of the river, according to the well established principle of universal public law: Vattel, § 266. The title of the riparian owner, derived by grant from the state, extends to low-water mark, not absolutely indeed in tidal streams, but subject to the public right of passage when the tide is high: Ball *v.* Slack, 2 Whart. 508. He has no right to make any erection, between high and low water, without express authority from the state; nor, of course, beyond low-water mark, into the bed and channel. The state can grant authority to make such erection, either to the riparian owner or to others, so long as the riparian owner is not thereby deprived of access to and use of the river as a public highway, which is implied if not expressed, in the grant to him of land bounded on the stream. Under this first and necessary restriction, the right of the Commonwealth to make any erections in the river for the improvement of its use as a public highway,

or to promote in any way the business and prosperity of the people, is undoubted and unlimited. Those who have shore or fishery rights took originally and still hold subject to this necessary transcendental power. Nor does the constitutional provision, that compensation shall be made to the owner of property taken for public use apply to cases of mere consequential damages: Monongahela Navigation Co. *v.* Coons, 6 W. & S. 101, and cases which have followed in its wake. As the state, therefore, might itself have erected or caused to be erected the wharf and pier built by the defendants below, without any responsibility to the plaintiff for any consequential damages to his easement, or right of drawing his seine on the shore, so neither is the grantee or licensee of the state liable for such damage. As to him it is *damnum absque injuriâ.* His right of fishing, just as the right of the riparian owner himself to fish on his own land, was subject to the higher right of the Commonwealth for the public good, and if impaired or destroyed by the power of the sovereign, whether under general or special laws, he has no ground of action. It was an original implied condition of his grant if he or those under whom he claims ever had one, and his title by long use can rise no higher than its presumed source.

It is no objection that the license is obtained on the application of the owner for his private advantage, to increase the value of his land. Such is always the case in regard to such works, whether projected by individuals or incorporated companies. Their object may be profit to themselves, but that of the state is the public good. Thus the powers granted to Josiah White, George F. A. Hauto and Erskine Hazard, to improve the river Lehigh by the Act of March 20th 1818, Pamph. L. 197, or to the Schuylkill Navigation Company, and many other corporations of a similar character, may have been solicited with a view to large gains or dividends, but such motives in the grantees in no way changed the character of the grant from a public to one of a private nature.

A more plausible objection is that the riparian owner, by applying for and obtaining a license to extend a wharf in front of his land, cannot thereby derogate from his own grant before made by him or those under whom he claims. But the wharf thus built is not thereby made part of his domain, does not become his property absolutely; beyond low-water mark the title to the structure followed that of the bed on which it was built and remained in the state, subject to the public right of passage and access to the river, and between high and low water mark; though the title to the soil remains in the riparian owner it is subject to the public right of passage over it as before. Since writing this opinion I have been referred to the 3d section of the Act of April 3d 1868, Pamph. L. 765, which enacts that the wharves thus erected shall be the property of the party licensed to erect them; but that of course does not affect,

[Tinicum Fishing Co. *v.* Carter.]

but rather confirms the positions taken. In building the wharf he is in fact the mere agent of the state. There is no privity therefore as to the subject-matter between the owner of the shore and his grantees, or the grantees of those under whom he claims. There is no covenant or duty which he owes to them, not to avail himself of such a privilege or accept such a license from the state. Public policy strongly supports the view we have thus adopted. Perhaps a more striking illustration could not be presented than that which appears on this record. It is a claim of a right to draw the seine for a few weeks in the spring of the year, during the season of shad fishing, over an extent of river front of one mile, the existence of which effectually precludes all improvements. Unless such paramount right exists in the Commonwealth, the extension of the accommodations of the harbor to meet the demands of the foreign and coasting trade, and the erections which the commerce of the whole port imperatively requires, might come to depend upon the will of one man, owning one-fourteenth of such an easement.

Judgment reversed, and a *venire facias de novo* awarded.

The case was again tried before Butler, P. J., when in addition to the evidence before stated there was the following :—The will of Christopher Taylor, the owner of land held by the defendants, dated in 1748 and proved December 24th of the same year, by which he devised the land to John Taylor and his fishing-place to David Sanderlin, his heirs and assigns : The record of the Orphans' Court on the estate of David Sanderlin, by which it appeared that by proceedings in partition in 1752, the fishing-right was adjudged " to the representatives of Mary Claxton, late wife of James Claxton" : Deed, Mary Claxton and others, dated February 6th 1805, reciting that the grantors are the heirs of *James Claxton,* who was one of the heirs of David Sanderlin, and conveying the fishery beginning at Darby creek and extending as far as fishing requires. Also, evidence that the wall had been erected in 1859 by the defendants before their incorporation, and that their property was within the limits of a "meadow company," who were authorized by their charter to erect walls to protect the meadow bank ; that the wall having been built by the defendants, was accepted by the meadow company, who agreed to keep it up : the expense of keeping up the walls is borne by a tax levied on the owners of the banks protected, and the defendants paid tax to the meadow company for this purpose.

The defendants submitted, amongst others, the following points :—

1. The evidence in this case fails to show any title to the fishing right claimed to be in the plaintiff.

2. No title to such fishing right as is set up in this case can be

[Tinicum Fishing Co. *v.* Carter.]

shown by use only, and as the plaintiff has failed to show title by grant, the verdict must be for the defendants.

3. The defendants have a right to maintain a proper wall for the protection of the bank of the stream, and are not responsible for any damages which might result thereto, even if any adverse fishing-right existed as is here claimed.

The court answered these points as follows :—

" The 1st point is disaffirmed. There is evidence for the consideration of the jury ; whether it is sufficient to establish title to the right set up, the jury must determine. We must submit it as we did before—the Supreme Court having decided this to be right.

" To the 2d point, we answer : The plaintiff certainly has failed to exhibit an express grant, but we cannot charge you that on this account your verdict must be for the defendants. The claim of the plaintiff is to an exclusive right to take fish in the river, opposite the defendants' land—which right was originally appertenant to the land—with an easement on the land itself, consisting in the privilege of landing seines, and doing such other things as are usual and necessary in prosecuting the business of fishing. The claim, therefore, is to a fishery—a species of property well known to the common law. And that title to such property may be established by prescription, is, we suppose, too clear for controversy. It is asserted by Bracton, that all incorporeal rights or services may be acquired by acquiescence and use. Indeed, all writers on the common law, as well as the civilians, have recognised the principle, that a right to any incorporeal hereditaments may be acquired by lapse of time. Whatever lies in grant may be prescribed for—prescription being but the evidence of a grant. Every elementary work treating of fisheries, recognises this principle, and asserts, that title to such property may be thus established. * *

" Is the defendants' point based upon some supposed peculiarity in the fishery claimed here, which distinguishes it from others ? Nothing of the kind was suggested on the argument. Nor is there room for it in the facts. In every essential particular this fishery is like all others. We are not referring now to the evidence, on which the plaintiff's claim of *title* to it rests—the extent and character of the *user* shown ; *that* is for the jury (as the Supreme Court has already decided) ; but to the *fishing-right itself*, existing in the Delaware river at the point in question, formerly annexed to the defendants' land, recognised and protected in Hart *v.* Hill, 1 Whart. 138, and to which the plaintiff here asserts ownership. This fishery, we repeat, is in all essential particulars like all others. Is it said, that the right is confined to taking *certain kinds* of fish ? If so, let it be granted. The same may be said of all, or nearly all, other fisheries. * * * Is it objected that the use is confined to a

11 P. F. Smith—3

[Tinicum Fishing Co. *v.* Carter.]

*limited period,* a few months, or even weeks, in the year? If so, it must be answered, that the same is true of most, if not all other fisheries. Fish can be taken only at certain seasons.

"Such objections are not, therefore, open to discussion; unless, indeed, we in Pennsylvania assume to be wiser than the fathers of the common law, and propose to review what they have settled.

"It is said that we have departed from the rules of the common law, in respect to prescriptions for *air and light;* and that the right to a several fishery, such as is here set up, is similar to such a claim; that the enjoyment or user is not distinctly hostile; that it does not put the owner of the land on his guard, and does not, therefore, give rise to the presumption of a grant. Without stopping to inquire whether we have, or have not, made such departure, it is sufficient that there is not, in our judgment, any similarity between the cases. Where one individual takes the property of another without permission, openly trespasses upon his rights, the act is hostile, and the owner has notice. The right to fish in this water for shad belonged to the owners of the adjacent land. If the plaintiff and those under whom he holds, regularly entered upon the water and took the fish during the period when they are to be found there—the only time at which they could be taken—used and enjoyed the fishery at the *only season when it was possible to use and enjoy it*—occupying the shore for landing nets, &c., the act was, clearly and palpably, hostile; if continued, was notice of a claim of right; and if acquiesced in for twenty-one years, gave rise to the presumption of a grant, precisely as in the case of any other easement, or incorporeal hereditament; and with no less distinctness and force—indeed, with much greater distinctness and force—than the user which was held to be sufficient in Worrell *v.* Rhoads, 2 Wh. 427, Jones *v.* Crow, 8 Casey 398; Trauger *v.* Sassaman, 2 Harris 514, and Wheatley *v.* Chrisman, 12 Id. 298. The conduct of the parties under such circumstances—the regular, continuous exercise of the privilege by the one, to the disadvantage of the other, and the acquiescence of the other therein, without interruption for so great a length of time—could be accounted for on no other reasonable hypothesis than the existence of a grant. The use and enjoyment in such a case is in no respect like the enjoyment of *air and light* from over another's land. It requires *active aggression*—the invasion of another's possessions, and the corporeal taking of his product of the property. We entertain no doubt, therefore, that title to this fishery may be established by prescription. Whether the *evidence* of user exhibited be sufficient for the purpose, is a different question.

"But is there not in the case before us a feature that distinguishes it from others of its kind, and comes in aid of the usage, as evidence of a grant? In the year 1748 Christopher Taylor, a

[Tinicum Fishing Co. *v.* Carter.]

former owner of the defendants' land, with the fishery here in controversy attached, devised the land to John Taylor, and the fishery to David Sanderlin—the latter in the following words: 'I give and devise to David Sanderlin my fishing-place to him his heirs for ever,' accompanied by language showing its location and character. The records of the Orphans' Court show that after the death of David Sanderlin, in a proceeding to part and divide his estate, the fishery was adjudged to the heirs of his daughter Mary Claxton. Next we find a deed dated 1805, from Mary Claxton (and others) to Joseph Carter, reciting that the grantors are 'the heirs of *James* Claxton who was one of the heirs of David Sanderlin,' and that as heirs of James Claxton they are 'seised in fee of the fishery' here in question, and from Joseph Carter down, we find a continuous chain of conveyance to the plaintiff.

"Now, while this does not show title in the plaintiff by express grant—a complete paper title—(because of the absence of proof that Joseph Carter's grantors were the descendants of *Mary* Claxton, the daughter of Sanderlin), it does show that the plain-tiff and those under whom he holds, exercised whatever privileges they enjoyed there, under a distinct claim of right, of which the public records were notice, and farther shows the extent and character of the right by reference to the source from which it came." * * *

The court disaffirmed the defendants' 3d point.

The verdict was for the plaintiff for $35.

The defendants took a writ of error, and assigned for error the answers to their points.

The case was argued on this writ of error, January 19th 1870, before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. WILLIAMS, J., being at Nisi Prius.

*W. Ward* and *W. McVeagh*, for plaintiffs in error.—As to the 1st and 2d points cited: 2 Bouv. Law Dict. 371; Burnham *v.* Webster, 5 Mass. 266; 2 Hilliard on Real Prop. 148, pl. 35; 3 Kent's Com. 332; Hart *v.* Hill, 1 Whart. 138; Carson *v.* Blazer, 2 Binney 475; Monongahela Navigation Company *v.* Coons, 6 W. & S. 101; Gray *v.* Bond, 2 Brod. & Bing. 667; 4 Bacon's Abr. 535; Lacey *v.* Annett, 9 Casey 169.

*W. Darlington*, for defendant in error.

The opinion of the court was delivered, May 5th 1870, by

SHARSWOOD, J.—Independently of the Acts of Assembly there is no exclusive right of fishing by the riparian proprietor opposite to his shore in any navigable river: Carson *v.* Blazer, 2 Binn. 475. In England the king has no power, and since Magna

[Tinicum Fishing Co. *v.* Carter.]

Charta never had, to grant an exclusive right of fishing in an arm of the sea: Blundell *v.* Catterall, 5 B. & Ald. 268; Brown *v.* Kennedy, 5 Harr. & Johns. 203. A private and several right to fish in a navigable river must have had its origin before Magna Charta: Angell on Tide Waters 25 n.; Mayor of Carlisle *v.* Graham, Law Rep. 4 Exch. 369. An arm of the sea extends as far into the interior of the country as the water of fresh rivers is propelled backwards by the ingress and pressure of the tide (Angell 73, Rex. *v.* Smith, 2 Dougl. 441), so as to occasion a regular rise and fall: Peyroux *v.* Howard, 7 Peters 324. In England there are such several and exclusive fisheries in navigable rivers attached to manors either by early grant from the crown or by prescription, because there might have been such a grant on which to found it. In this state there can be no such prescription. Prescription rests upon the presumption of a grant, which has been lost by process of time. No prescription therefore can have a legal origin where no grant could have been made to support it: 2 Black. Com. 265; Gateward's Case, 6 Rep. 59 b; Lockwood *v.* Wood, 2 Queen's Bench 64. Neither the proprietaries of Pennsylvania nor New Jersey ever owned the bed of the Delaware. Their respective grants were to low-water mark on either side. The bed of the river and the river itself were in the crown, and passed by force of the revolution and the definitive treaty of peace, September 3d 1783, recognising their sovereignty and independence, to the two states, to be owned and enjoyed on the same principle upon which a navigable river flowing between two coterminous nations is held. This does not deny to the legislatures of these respective states by compact and laws, the power to regulate and restrain the common right of fishing both as to riparian proprietors and others: Bennett *v.* Boggs, 1 Bald. 76. The right of the plaintiff below to any exclusive fishery in the Delaware opposite to any part of the shore, whether by right of title to the soil or derived by grant, actual or presumed, from the riparian owner, depends upon statute. It is put on that ground by the decision of this court in Hart *v.* Hill, 1 Whart. 124. The Act of Assembly, entitled, " An act to regulate the fisheries in the river Delaware and its branches and for other purposes," passed February 8th 1804, 4 Sm. L. 118, and the supplement of February 23d 1809, 5 Id. 5, under a compact with New Jersey, are the statutes to which we must refer. They define " a pool or fishing-place" to be " from the place or places where seines or nets have been usually thrown into the water to the place or places where they have been usually taken out; or from the place or places where they may be hereafter thrown into the water, to the place or places where they may be taken out;" and the 4th section of the Act of 1804 provides " that whenever any fishery is occupied upon the river Delaware, either the landholder, tenant in

[Tinicum Fishing Co. *v.* Carter.]

possession or some respectable person, appointed by the fishing company, shall apply to the prothonotary of the respective county, where such fishery may be and give a bond, &c., and shall moreover give unto the said prothonotary a description in writing of their pool or fishing-place, together with the name of the township or place in which it is situated." The object of the legislature manifestly was to give notice to all concerned of any pool or fishing-place where an exclusive right to fish was claimed, and especially, if claimed by a fishing company—not landholders or tenants in possession—to give notice to the riparian proprietor and purchasers from him. Wherever such fishery is dissevered from the ownership of the bank, how else than by some such record are purchasers to be protected? No possession or mark on the ground would indicate to them that there was any adverse claim. No evidence was given on the trial in the court below of any entry in the prothonotary's office of the pool or fishing-place occupied by the plaintiff, and those under whom he deduced his right. The onus of showing this was upon him. Without proving a compliance with the law he showed no right to any exclusive fishery in the river. "It is hardly necessary to remark," said Huston, J., in Hart *v.* Hill, 1 Whart. 132, "that it is so much of the river, &c., that is the fishing-place, and not so much of the bank."

The plaintiff below therefore could not pretend to any title to a several and exclusive fishery in the river. He did claim a right to draw seines on the soil of the riparian proprietor, not as appertenant to any dominant tenement, but as an incorporeal hereditament and easement in gross vested in him and derived from his ancestors or their grantees in fee simple. He had no dominant tenement in the river to which the shore was servient, as was the case in Gray *v.* Bond, 2 Brod. & Bing. 667. He did not prescribe in *que* estate, in himself and those whose estate he held. He did not claim a mere passage over the land, but a right to take fish there,—a profit *a prendre in alieno solo*. That a profit *a rendre*,—as a rent issuing out of land may be granted or prescribed for in gross in fee may be admitted. Whether a profit *a prendre*, as a common of pasture, a right to dig turves, or clay, or coal, may be is not so clear. The cases and opinions are discordant. But something more was claimed here than the right to take fish. "A fishery is in the river," says Huston, J., "and is not the space between high and low water mark, though the use of that space may be necessary in the use of it and may be included in the term fishery. The men employed in carrying the rope attached to one end of the seine, may walk on the space between high and low water; and on the same space may place logs or boards or stones to make what is called a pound, in which to throw the fish when taken out of the net, and on that space do all that has been usual and is necessary to the use of a fishery:"

[Tinicum Fishing Co. *v.* Carter.]

1 Whart. 137. Whether the plaintiff meant to claim an exclusive right or in common with the owner of the soil does not appear. I infer that his claim was exclusive. That a fishing-place may be granted, separate from the soil may be considered as settled in this state in Hart *v.* Hill, 1 Whart. 124. It is to be noted that no question arose in that case, nor was any point decided as to the nature of such a grant. It would seem, however, to have been considered an incorporeal hereditament. That there may be the grant of an easement in gross personal to the grantee is not to be denied. Chancellor Kent says of a way, "If it be a right of way in gross or a mere personal right, it cannot be assigned to any other person nor transmitted by descent. It dies with the person, and it is so exclusively personal that the owner of the right cannot take another person in company with him:" 3 Kent Com. 420. However it was decided in Wickham *v.* Hawker, 7 Mees. & Welsby 63, on the authority of the Duchess of Norfolk's case in the Year Books, 12 Hen. VII. 25, 13 Hen. VII. 13, pl. 2, that a license reserved by a grantor of land, not for mere convenience and pleasure, but for profit, implied the right to employ servants, and also the right to assign it to others. There a reservation of a liberty to hunt, fish, hawk and fowl on the granted premises to the grantor and his heirs was sustained as a new grant though for all that appears it was *in gross*. Professor Washburne in his valuable work on Easements, p. 8, has laid down as the result of the authorities this broad position: "A man may have a way *in gross* over another's land, but it must, from its nature, be a personal right not assignable nor inheritable; nor can it be made so by any terms in the grant any more than a collateral and independent covenant can be made to run with the land." In Ackroyd *v.* Smith, 10 Common Bench 164, there was a grant of a certain close in fee with a right to the owners and occupiers thereof and all persons having occasion to resort thereto, of passing and repassing for all purposes over a certain road and the grantor had conveyed the close with the appertenances to the defendants, who pleaded, that they had committed the trespass complained of, in using the road for their own purposes, it was held that the right in question was in gross, did not inhere in the land nor concern the premises conveyed or the mode of occupying and enjoying them and therefore did not pass to the defendants by assignment. Mr. Justice Cresswell said: "If a way be granted in gross it is personal and cannot be assigned. So common in gross *sans nombre* may be granted, but cannot be granted over, per Treby, C. J., in Weekly *v.* Wildman, 1 Ld. Raymond 407. It is not in the power of a vendor to create any rights not connected with the use or enjoyment of the land and annex them to it; nor can the owner of land render it subject to a new species of burthen so as to bind it in the hands of an assignee." So in Post *v.* Pearsall, 22 Wend. 425,

[Tinicum Fishing Co. *v.* Carter.]

which was a claim for a landing and place of deposit for merchandise in the course of transhipment on the bank of a navigable river, Chancellor Walworth said : " Nor can it be sustained as an ordinary easement, founded on a presumed grant from the owner of the premises, in which the right or easement is claimed. Such easements are either personal and confined to an individual for life merely, or are claimed in reference to an estate or interest of the claimant in other lands as the dominant tenement; for a profit *a prendre* in the lands of another, when not granted in favor of a dominant tenement, cannot properly be said to be an easement, but an estate or interest in land itself." This principle, Mr. Washburne thinks, furnishes a clue to reconcile the authorities. " The distinction seems to be this : If the easement consists in a right of profit *a prendre*, such as taking soil, gravel, minerals and the like from another's land, it is so far of the character of an estate or interest in the land itself that if granted to one in gross, it is treated as an estate and may therefore be for life or inheritance. But if it is an easement proper ; such as a right of way and the like and is granted in gross, it is a mere personal interest and not inheritable." Washburne on Easements, p. 9. There is a very plain distinction between a grant of such a profit exclusive of the owner and one in common with him. It was held in Caldwell *v.* Fulton, 7 Casey 475, that the grant of a right to dig and carry away stone coal, in the lands of the grantor without stint, was the grant of an interest in the land itself. But it is different when there is such a right granted in common with the owner of the soil as in Johnston Iron Company *v.* The Cambria Iron Company, 8 Casey 241; Clement *v.* Youngman, 4 Wright 341 and Gloninger *v.* The Franklin Coal Company, 5 P. F. Smith 9. Such a right may be granted in fee and assigned, but is an estate in the land distinguishable from a mere easement upon or over it. A fishing-place is in the same category. A right to take fish is a profit *a prendre in alieno solo.* It requires for its use and enjoyment exclusive occupancy during the period of fishing. It implies the right to fix stakes or capstans for the purpose of drawing the seine and the occupancy of the bank at high tide as well as the space between high and low water mark as far as may be necessary and usual. The grantee in the nature of things must have exclusive possession for the time he is fishing and for that purpose : the grantor at all other times and for all other purposes. Land or an interest in land cannot be prescribed for : 2 Black. Com. 264. It may well be questioned whether such a profit *a prendre* can be, especially when not pleaded in a *que* estate, but in a man and his ancestors. That kind of user for twenty-one years and upwards which may be sufficient to raise a presumption of a grant of a mere easement will not support a claim for an interest in the land itself or its profits. " An annual entry upon another man's land to cut timber,

to feed cattle, to hunt or fish, can never give title," says Chief Justice Woodward in Wheeler *v.* Winn, 3 P. F. Smith 122.

But if the right claimed here had been a mere ordinary way in gross, the evidence would not have been sufficient to create the presumption of a grant. Had it been set up as appertenant or annexed to a several fishery in the river or to adjoining lands,—had there been a dominant and servient tenement,—if the plaintiff had prescribed in *que* estate, in him and those whose estate he had,—it might have been otherwise. There is a manifest reason for a distinction in the nature and amount of the evidence required in case of such an easement and one merely in gross. There is a certainty as to the owners and occupiers of the land of which the appertenancy is predicated, which does not exist where the claim is in gross. A fair presumption arises of knowledge that the exercise of it is under a claim of right. This is absolutely required in all cases of prescription: Washburne on Easements 86. The circumstances of the enjoyment must be such that the knowledge and acquiescence of the owner may be presumed: Gray *v.* Bond, 2 Brod. & Bingh. 667. *Lex intendit vicinos vicini facta scire.* If I should see the owner or occupier of an adjoining lot or farm or his servants constantly crossing my land to the highway, I may with reason, and without being unneighborly, dispute it and insist upon an acknowledgment that it is only permissive so that it may not grow into right. But if a stranger with whom I may well be presumed to be unacquainted or his son or collateral heir after his death, walks over occasionally and especially at long intervals, on what ground is it to be inferred that I know it to be under any pretence of title? Must a farmer see to it that every one who crosses his field to gun or fish asks his permission? Could a man establish a presumptive right by showing that regularly every year for twenty-one years and more on the 4th of July he had, in view of the proprietor, walked up to his well or spring and without his permission drawn a bucket of water? As well might an angler, resorting constantly to some shady spot on the bank of a stream, set up in process of time a presumptive right against the owner of the soil, of passage and of fishery. Many a lover of the sport for more than a quarter of a century has pursued every season one of our mountain brooks for miles of its course for the speckled trout with which they abound.

A man who owns land on the bank of a navigable river in which there is a common right of passage and fishery is not under the necessity of keeping himself in hot water all his lifetime, by warning off or prosecuting every trespasser who comes there to fish with the rod or the seine, nor can he be expected to recollect and recognise that the same man who is there fishing one year, returns the next, much less be bound to inquire into his family and lineage in order to be sure that his claim of right, even if he knows it to

be such, is not transmitted to his heirs. Nay, if he can pass his right by lease or assignment or exercise it by agent or servant, it may every year be in the hands of a different person. It is manifest that no title by such kind of user to an inheritable easement in gross could be safely allowed to grow up. All this is especially true of the use of the beach of a navigable stream where men, boys and cattle wander *ad libitum.* Thus, where a party owned land adjoining a beach, but there being no fence between his land and the beach, his cattle were accustomed to pass on to the beach and thence over adjoining beaches, it was held not to be such an adverse enjoyment as to gain a prescriptive right thereby: Donnell *v.* Clark, 19 Maine 174. So, a person cannot acquire a title by prescription by pasturing his cattle in an open common, training field or highway: Thomas *v.* Marshfield, 13 Pick. 240; First Parish *v.* Beach, 2 Id. 60 n.

The cases referred to by the learned judge below were all, except one, cases of a dominant and servient tenement, prescriptions in *que* estate. As in Gray *v.* Bond, 2 Brod. & Bing. 667, where a lord of a manor from time immemorial had been seised of a several fishery in the river Derwent, a river in which the tide ebbed and flowed, and the lessees of the fishery had publicly landed their nets on the shore of it for more than twenty years, and had at various times dressed and improved the landing, it was held to have been properly left to the jury to presume a grant of right of landing to the lessees of the fishery by some owner of the shore. Such, too, were the cases of Worrall *v.* Rhoads, 2 Whart. 427; Wheatley *v.* Chrisman, 12 Harris 298; and Jones *v.* Crow, 8 Casey 398. So were Garrett *v.* Jackson, 8 Harris 331, and Reimer *v.* Stuber, Id. 458. The excepted case was Trauger *v.* Sassaman, 2 Harris 514. It was there held that the undisturbed and exclusive use by two congregations of a piece of ground adjoining a church in which they both worshipped, for fastening therein horses and carriages during divine service for above seventy years, will give title thereto by the Statute of Limitations. "There is not a *scintilla* of testimony," said Mr. Justice Coulter, "that anybody else claimed possession in all that lapse of time or had any kind of possession or occupancy or claimed to have it in opposition to them." That, then, was not the case of a mere easement but an interest in land.

Nor is it an universal principle without exception that whatever incorporeal hereditament may be granted may also be acquired by long and uninterrupted user. On the contrary, it is well settled that a right or privilege claimed by prescription must be such as must reasonably be presumed to have been granted. An owner of land who is *compos mentis* may grant an easement on or over it, which will in effect destroy the usufruct of his property; but no length of time can raise the presumption of such a grant.

[Tinicum Fishing Co. *v.* Carter.]

"No man," says Mr. Phear, "will be presumed to have made the grant of an easement, such that its exercise may be large enough to destroy the usufruct of his property:" Phear on Rights of Water 81. Our departure from the common law, which allows of the prescription of a grant of an easement of light and air through ancient windows, might well have been put upon this principle, in view of our special circumstances, so different from those of the old country: Hoy *v.* Sterrett, 2 Watts 331; Wheatley *v.* Baugh, 1 Casey 532; Hazlett *v.* Powell, 6 Id. 296; Haverstick *v.* Sipe, 9 Id. 368. A prescriptive claim of common without stint as annexed to a messuage without land has been held bad: Benson *v.* Chester, 8 Term Rep. 396. So, also, a plea that the occupiers of a brick-kiln for thirty years had enjoyed, as of right, the privilege to dig, take and carry away from the plaintiff's close as much clay as was at any time required by them for making bricks at the kiln, was overruled, because there could arise no reasonable presumption of such a grant: Clayton *v.* Corby, 5 Queen's Bench 415. In like manner and on the same principle in Post *v.* Pearsall, 22 Wend. 425, it was decided that the public cannot acquire a right, by an uninterrupted use of twenty years with the knowledge of the owner, of his soil on the bank of a navigable river as a landing and place of deposit for property on its transit to and from vessels navigating such water.

On the whole we are of the opinion that the evidence given in behalf of the plaintiff in the court below, did not present such a case as ought to have been submitted to a jury. The extent of the fishing-place claimed was a mile on the river, a very unusual length, as I have reason to believe, if not entirely unprecedented. There was no fixed point at which it was alleged that the seine was cast in and drawn out. The right claimed was to select any point in this unusually long distance. The whole shore was asserted to be one fishing-place. There was ample space for three or four. It is true that in swift water above tide the sweep of the net is much more rapid and shorter than in tide water where the current is sluggish. The evidence below in regard to the casting-in and hauling-out place was very vague and indefinite. For all that appears, one year it might have been at one place the next at another, allowing, as is the case in most fisheries, a different place for high and low water. Even if the proof had been distinct and clear that every year for twenty-one consecutive years during the six weeks that the season for shad fishing usually lasts, somebody, lessee or other person under this claim of right, had fished along the shore from Hart's wharf to the mouth of Darby creek, which, however, was far from being the case, it would have been insufficient to establish the title set up by the plaintiff. We must dismiss from our consideration the fact that evidence was given of a devise of a fishing-place by a former owner of the shore, under

[Tinicum Fishing Co. *v.* Carter.]

which the plaintiff attempted to deduce title. He failed, in the opinion of the learned judge below. Whether he was right or wrong in that opinion, is a question which we have not before us on this writ of error. It ought to have no influence in determining the other important and distinct question, whether the right to a fishing-place *in alieno solo* on the bank of a navigable river can be established by showing that those under whom the plaintiff claims by grant, devise or inheritance, not of any dominant tenement, but of a separate hereditament in gross, have for twenty-one years and upwards once a year fished at that place. If this can be done it would apply as well when there was no evidence of there ever having been such a grant or devise as when there was. It would be of very dangerous consequence, as we apprehend, to all riparian proprietors upon navigable rivers, if by this sort of parol evidence of user, they could practically be deprived of their frontage, by being cut off from all the advantages of it for wharves, landings and other improvements; in short, lose the entire usufruct of their property in what may be regarded as its most valuable quality.

Judgment reversed, and a *venire facias de novo* awarded.