## Lindenmuth, Appellant, *v.* Safe Harbor Water Power Corporation.

Argued May 26, 1932. Before FRAZER, C. J., SIMP-
SON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Vincent K. Keesey,* with him *George Hay Kain,* for
appellant.—The right granted by Fry to Witmer was an
easement in gross and was not legally capable of assign-
ment, even though so intended, and existed only during
Witmer's lifetime: Riefler v. Storage Water Power Co.,
232 Pa. 282; Com. v. Zimmerman, 56 Pa. Superior Ct.
311; Lau v. Mumma, 43 Pa. 267; Hogg v. Bailey, 5 Pa.
Superior Ct. 426.

Even if the privilege granted by Fry to Witmer was
assignable, it was exercised and exhausted by the erec-
tion of a dam by the McCall Ferry Power Co. and its
successor, the Pennsylvania Water & Power Co.: Hogg
v. Bailey, 5 Pa. Superior Ct. 426.

The Fry-Witmer agreement does not justify defend-
ant under any circumstances in cutting down trees.

*Frederick B. Gerber,* with him *George T. Hambright*
and *John E. Malone,* for appellee.—The rights granted
by Fry to Witmer were legally capable of assignment
and their existence was not limited to the duration of
the life of John M. Witmer, but exist in perpetuity:
Tide Water Pipe Co. v. Bell, 280 Pa. 104.

The right granted by Fry to Witmer was not exer-
cised or exhausted by the erection of a dam by the Mc-

Call Ferry Power Co. and its successor, the Pennsylvania Water & Power Co.

The Fry-Witmer instrument justifies the defendant in cutting down trees: Hammond v. Hammond, 258 Pa. 51.

OPINION BY MR. JUSTICE MAXEY, September 26, 1932:

On June 4, 1902, David Fry and wife granted by an agreement recorded January 25, 1906, to John M. Witmer, his heirs and assigns, "the right at any and all times hereafter to cause by the erection of dams or other works the water of the Susquehanna River to flow back upon or be withdrawn from Fry's land" (along which the Susquehanna River flowed), "together with all of the rights, easements, privileges and appurtenances in and to said lands which will be required or needed for the full enjoyment of the right of backing and flowage." This grant was preceded by a "Whereas" clause, in which it was set forth that Witmer "desires to cause to be built a dam or dams and other works in and along the Susquehanna River, the effect of which will or may be to back the water of said river and cause it to overflow or be withdrawn from the lands of" Fry. The consideration was one dollar when the grant was made, and the further sum of one dollar on April 1, 1903.

The plaintiff in this action is a successor in title to the lands of Fry affected by the grant. The defendant, Safe Harbor Water Power Corporation, became by various recorded instruments, the assignee of the rights of Witmer in the grant of June 4, 1902.

In 1905, the McCall Ferry Power Company, an intermediate in the chain of title to this easement grant between Witmer and defendant, began the construction of a dam across the Susquehanna River, about sixteen miles below Fry's property. The work progressed until 1907 when, for financial reasons, it was suspended. In 1910, the dam was completed by the Pennsylvania Water and Power Company, another intermediate in the

chain of title to the grant. This dam completed in 1910 does not back the river waters on to any part of the Fry property. John Witmer died February 10, 1927. On June 19, 1930, the Pennsylvania Water and Power Company assigned its rights in the Fry-Witmer agreement to the defendant and the latter company constructed a dam across the river six miles below plaintiff's property.

Before the completion of this dam the defendant began cutting down some large sycamore trees on plaintiff's property where a bungalow was situated. Plaintiff sought to restrain this cutting of trees by a preliminary injunction. Defendant asserted its rights to cut down these trees as successor to Witmer in the easement grant of 1902. At the hearing the bill was amended by adding the averment that "the effect of the dam now being built by defendant will be to flood back the waters of the Susquehanna River upon plaintiff's aforesaid property and to destroy or render uninhabitable the bungalow built thereon." The prayer for relief was amended by adding: "......and to issue an injunction restraining defendant, its agents and employees, from flooding or continuing to flood the aforesaid property of the plaintiff until or unless it shall have, by proper proceedings, acquired the right so to do."

In an amended answer, defendant admitted the acts charged, but justified them as being in the exercise of its rights as assignee under the agreement of 1902, and it asserted that the cutting down of the sycamore trees was "necessary for the proper exercise and enjoyment" of its rights and denied that it had to resort to the exercise of the right of eminent domain in order lawfully to flood the plaintiff's lands or remove the trees.

A preliminary injunction was granted and continued until final hearing. No facts were in dispute and the chancellor filed a decree nisi dismissing the bill. A final decree was entered in accordance therewith. An appeal to this court followed.

Appellant's propositions are these:

(1) The agreement of 1902 was the grant of an easement in gross, and the law does not recognize assignments of easements in gross.

(2) By the terms of the grant itself, the easement was not assignable.

(3) The easement or privilege was exhausted by the building in 1905-1910 [16 miles below Fry's property] of a dam by the McCall Ferry Power Company and the Pennsylvania Water and Power Company (both intermediates in the chain of title to the easement in question).

(4) The easement or privilege did not include the right to remove trees.

As to the first proposition: "An easement in gross is defined as a mere personal interest in the real estate of another. The principal distinction between it and an easement appurtenant is found in the fact that in the first there is, and in the second there is not, a dominant tenement. The easement is in gross, and personal to the grantee, because it is not appurtenant to other premises. The great weight of the authorities supports the doctrine that easements in gross, properly so called because of their personal character, are not assignable or inheritable, nor can they be made so by any terms in the grant [citing, inter alia, Tinicum Fishing Co. v. Carter, 61 Pa. 21]. Many cases which seem to be in conflict with this rule are reconcilable because under their facts the rights in question were profits a prendre and not easements in gross. However, it has been held directly that an easement in gross may be assigned [citing only Goodrich v. Burbank, 12 Allen (Mass.) 459]. Under the English law a private easement can be held only as appurtenant to a dominant tenement, and an easement granted to an individual in gross amounts to no more than a personal license; so that, although the grant be accompanied by words of inheritance, the privilege conferred inures only

to the personal benefit of the grantee, and, since this is so, necessarily dies with him": 9 R. C. L. 739, section 6.

In the instant case appellant argues that the privilege granted appellee's predecessor in title was an easement in gross and, therefore, not assignable. Appellee argues that easements in gross in Pennsylvania are not necessarily personal to the grantee and are not necessarily nonassignable. While the precise question of the assignability of such easements has never been definitely raised in the pleadings of any case reaching the appellate courts of Pennsylvania, there is very weighty Pennsylvania judicial dictum against the assignability of easements in gross. In Tinicum Fishing Co. v. Carter, supra, Justice SHARSWOOD quotes Chancellor KENT to the effect that easements in gross cannot be assigned to any other person or transmitted by descent and he also quotes from Professor Washburne on Easements to the effect that an easement in gross cannot be assigned "nor can it be made so by any term in the grant." However, in the Tinicum Fishing Company Case the subject of controversy was not an easement in gross, but a profit a prendre.

The decision of the case now before us does not turn on the question of the assignability of easements in gross, for the easement created and made assignable by the agreement of June 4, 1902, was an easement appurtenant. It is an established principle in almost all jurisdictions that "an easement will never be presumed to be a mere personal right when it can fairly be construed to be appurtenant to some other estate. Whether an easement is in gross or appurtenant must be determined by the fair interpretation of the grant or reservation creating the easement, aided if necessary by the situation of the property and the surrounding circumstances": 19 C. J. 868.

In 9 R. C. L. 737, section 5, there is this statement: "An appurtenant easement is an incorporeal right which, as the term implies, is attached to and belongs with

some greater or superior right—something annexed to another thing more worthy, and which passes as incident to it. It is incapable of existence separate and apart from the particular land to which it is annexed. It is obvious that the easement, to be appurtenant, must be attached to the dominant estate, and it can become legally attached only by unity of title in the same person to both the dominant estate and the easement claimed. In determining whether a particular easement created by grant is or is not appurtenant to land, two matters must be considered—the nature of the right and the intention of the parties. In the first place, it is a rule that nothing can be appurtenant unless it agrees in nature and quality with the thing to which it is claimed to be appurtenant. For example, the right to overflow lands is not an appurtenance agreeing in nature or quality with the land itself but more properly appertains to something that has been put upon the land, such as a mill [Citing Wilcoxon v. McGhee, 12 Ill. 381, 54 American Decisions 409; Leonard v. White, 7 Mass. 6, 5 American Decisions 19, 81 A. S. R. 764]. In addition, the easement must bear some relation to the use of the dominant estate. A right not connected with the enjoyment or use of a parcel of land granted cannot be annexed as an incident to that land, so as to become appurtenant to it. Some authorities hold that a way cannot be appurtenant to a close at which it neither begins nor ends; that one terminus must be the land or tenement of the person claiming it; but the more liberal view is adopted that, notwithstanding neither terminus of the way is upon the close to which it is claimed appurtenant, it will nevertheless be so regarded, if it clearly appears to have been the intention of the parties that it should be [Citing Graham v. Walker, 78 Conn. 130, 61 A. 98; Jobling v. Tuttle, 75 Kan. 351, 89 Pac. 699]. In Ladd v. Boston, 151 Mass. 585, 24 N. E. 858, Mr. Justice HOLMES, in the Supreme Judicial Court of Massachusetts, said: "In order to attach an easement to a dominant estate, it is not

necessary that it should be created at the moment when either the dominant or the servient estate is conveyed, if the purport of the deed is to create an easement for the benefit of the dominant estate."

In the last named case "plaintiff's predecessor in title, and the then owner of the land taken by the city for the new courthouse, were parties to an indenture whereby it was covenanted, among other things, that the land in front of the plaintiff's lot, and just across the street, should not be built upon beyond a certain line, on what is now Pemberton Square, and should be subject to some other similar negative restrictions."

Appellant concedes the following in his paper book: "If the grant of an easement in gross contemplates the making of expenditures by the grantee for a work which the easement is designed to serve, then, after the expenditures are made, the easement will attach to the work and pass, as an appurtenance thereto, to the grantee's heirs or assigns."

The grant of an easement in this case did contemplate the making of expenditures by the grantee for a work, to wit, the power dam which the easement was designed to serve. It is true that these expenditures were not made and the dam was not built at the time the original grantee, Witmer, assigned his interests in the agreement of June 4, 1902, or even at the time he died, but we regard these facts as not controlling. When Fry granted the easement to Witmer, Fry well knew that this easement was to be appurtenant to the dam which Witmer or his assigns planned to build on the Susquehanna River. The quotation from Ladd v. Boston, (supra), is applicable here. It clearly is the purport of the deed from Fry to Witmer to create an easement in Fry's land for the benefit of the dominant estate, i. e., the power dam to be erected. If, for example, Fry conveyed to Witmer by deed the right to enter upon Fry's land occasionally to dump refuse into the river flowing by that land, we would have a typical case of an easement in

gross, which in most jurisdictions would not be inheritable or assignable, but the easement which Fry conveyed to Witmer and his assigns was no such easement in gross as the one just used in the illustration and which but for its creation by deed would be a mere license. In a document creating Witmer's easement it was preliminarily set forth that Witmer "desires to cause to be built a dam or dams and other works in and along the Susquehanna River, the effect of which will or may be to back the water of said river and cause it to overflow or be withdrawn from the lands of" Fry. This expressly tied the flooding to the proposed dam. Fry proceeded to convey to Witmer, "his heirs, executors, administrators and assigns the right at any and at all times hereafter to cause the water on the Susquehanna River to flow back upon and overflow" Fry's land. This agreement clearly implied that Witmer had rights in lands on which a dam was to be built and that this privilege of flooding granted to Witmer or his assigns a right that was necessary to the complete exercise of Witmer's right to build that dam. To convey to Witmer the right to flood Fry's lands by building a dam unless Witmer at the time either owned land on which the dam was built or was about to acquire such land, would be to convey to Witmer a right impossible to exercise. Just as in the case of Wilcoxon v. McGhee, 12 Ill. 381, supra, the right to overflow lands was appurtenant to a mill, so in the case before us the right to overflow the land of Fry and his assigns was appurtenant to the power dam, a dominant estate not in actual existence at the time the easement was created, but which was to be created according to the clear purport of the deed. The building of this dam was expressly within the contemplation of both parties.

The mere fact that the dam and the overflowed lands of Fry were not contiguous is of no legal effect. This court held in Anania et al. v. Serenta, 275 Pa. 474, 119 A. 554: "The dominant and servient tenements need not be adjoining: 19 C. J. 864. ...... The intervening

ground, in the ownership of others, through which the means of the easement's enjoyment passed, will not detract from the easement. The right to convey water from a distant source may be appurtenant to land separated from the source of supply: Cady v. Springfield Waterworks Co., 134 N. Y. 118, 121. As to the contending parties, the intervening ground, in the ownership of others, in which the pipe is laid, may be considered attached to the ownership of the dominant estate for the use to which it is put."

In Jobling v. Tuttle, 89 Pac. 699, the Supreme Court of Kansas said: "Plaintiff's hotel is situated on the block of ground adjoining the tract upon which the springs are; but seven lots which do not belong to the hotel property intervene. The springs are disconnected from the dominant estate to which it is claimed they are appurtenant. There is no connection between the two to indicate that one is servient to the other."

In the instant case, while, until the dam was completely built, there was no such physical connection between the proposed dam and the estate subservient to it on Fry's land as to suggest to a prospective purchaser of Fry's land the existence of this easement, this deficiency was supplied by the fact that the grant of the easement to flood Fry's land was recorded in the proper office. After the dam was built, the relationship between the dominant and the servient tenements became physically obvious.

The easement granted to Witmer and his assigns was clearly not an easement so personal to Witmer as to constitute an easement in gross, which is a right of only slightly higher degree than a mere license, but as abundantly appears from the deed of grant and from all of the attendant matters aliunde,.it was an easement appurtenant to the land on which Witmer or his assigns were to build the dam and to the dam itself when it came into substantial being. It was therefore assignable in law.

As to the second proposition: A fair construction of the agreement of June 4, 1902, is that Witmer intended to receive and Fry intended to grant rights in perpetuity. The instrument provides that the release of damages binds not only Fry, but also "his heirs and assigns," and further that the covenant for further assurances binds Fry, "himself, heirs and assigns." If the instrument were construed as the granting of a right personal only to Witmer, it would follow that on the death of Witmer, the dam would have to be demolished. It is unreasonable to believe that Witmer would enter into an agreement which contemplated making expenditures essential to the exercise of the right which he secured from Fry if this right was to be only of an evanescent nature. A further answer to the second proposition is found in the words of the instrument as follows: "The party of the first part does hereby grant, sell and convey unto the said party of the second part, his heirs, executors, administrators and assigns, the right at any and all times hereafter to cause the water of the Susquehanna River to flow back upon and overflow the land of the party of the first part."

As to the third proposition: The McCall Ferry Power Company when it began the construction of its dam sixteen miles below Fry's property did not own the rights conveyed to Witmer in the agreement of June 4, 1902, and did not acquire them until several years later, and there is not the slightest foundation for the argument that the building of this dam was even an exercise of any rights granted under that agreement, much less an exhaustion of them. The McCall dam is located so far down the river that it does not affect the Fry land in the slightest degree; therefore, in no way can it be construed as either an exercise or an exhaustion of the right of flowage which was granted to Witmer and his assigns by the 1902 agreement. Furthermore, that agreement provides "for the erection of a dam or dams or other works."

As to the fourth proposition: The four sycamore trees whose cutting and removal defendant is seeking to enjoin stand in the bed of the river. When the water is dammed, they will die, decay, topple over and drift down stream to the prejudice of the defendant's power plant. The full enjoyment of the rights granted by the agreement of 1902 necessitates the destruction of the trees. The grant of a right involves the grant of whatever is necessary to the enjoyment of that right. Furthermore, the agreement grants to Witmer and his assigns "all of the rights, easements, privileges and appurtenances in and to" Fry's lands, "which may be required for the full enjoyment of said rights."

The decree is affirmed at the cost of the appellant.

CONCURRING OPINION BY MR. JUSTICE SIMPSON:

I concur in the judgment in this case, but would plant the decision of the main question on a far broader ground than the majority does. The basis of plaintiff's complaint is that his land,—acquired from Fry through various mesne conveyances, and subject, therefore, to the agreement between Fry and Witmer (quoted at length in the opinion of the majority),—will be injured by being overflowed by the waters of the Susquehanna River, if defendant, an assignee of Witmer, is permitted to construct or raise its dam in the river. Plaintiff contends, therefore, that defendant should be enjoined from continuing its work, until it has, by appropriate condemnation proceedings, obtained the right so to do. The agreement between Fry and Witmer expressly provides, however, that it shall bind all subsequent grantees under Fry, one of which plaintiff is, in favor of all later assignees who acquire title to the release specified in the agreement through Witmer, as defendant does, and this stipulates that the land described therein, and now the subject-matter of the present controversy, "shall be free, clear and discharged of all claims on the part of [Fry] his heirs and assigns for damages thereby caused to the

said land......[by Witmer or his assigns] by the erection of a dam or dams" in the river. This being so, plaintiff can have no claim against defendant, and hence cannot insist upon a jury of view to assess damages which legally do not exist. Alleging, as its only answer on this point, that the Fry-Witmer agreement provides for an easement in gross does not aid plaintiff, since the agreement, no matter by what technical name it is called, in unmistakable language excludes all idea of this hoped for recovery of damages: Tide Water Pipe Co. v. Bell, 280 Pa. 104, 112.

Justices SCHAFFER and LINN join in this concurring opinion.