**UNITED STATES of America, Plaintiff,**

v.

**64.88 ACRES OF LAND, MORE OR LESS, Situate IN ALLEGHENY COUNTY, PENNSYLVANIA, and Charles F. Chubb et al., Defendants.**

Civ. A. No. 14037.

United States District Court
W. D. Pennsylvania.

July 27, 1956.

D. Malcolm Anderson, Jr., U. S. Atty., Pittsburgh, Pa., for plaintiff.

David B. Buerger, Alexander Black, Jr., Smith, Buchanan, Ingersoll, Rodewald & Eckert, Pittsburgh, Pa., for defendant.

WILLSON, District Judge.

On December 5, 1955 the government filed a complaint and declaration of taking for the acquisition of a clearance easement on 64.88 acres (hereinafter to be called 64 acres) of land in Allegheny County, Pennsylvania, for use in connection with the Greater Pittsburgh Airport. The sum of $2,450 was deposited in the Registry of the Court as estimated compensation. On the same date this court by Judge Marsh entered an order of judgment on the declaration of taking. His order, however, provided: "* * * This cause is held open for such other further orders, judgments and decrees as may be necessary in the premises," which is the usual and customary order in like cases entered by the judges in this district.

On December 30, 1955, one Charles F. Chubb, designating himself as defendant, filed an answer to the complaint. He is the owner, he says, not only of the 64 acres of land, but says that this acreage is part of a larger tract of about 271 acres from which the land taken by the government is but a portion. The answer objected to the taking on four grounds: (1) that the complaint and declaration are so vague and uncertain that defendant is unable to ascertain what damages will be caused by the taking; (2) that it is obvious from the pleadings that the land has been acquired for the pathway for the flight of aircraft, although such right of user is not set out in either the complaint or declaration; (3) that although the pleadings indicate that merely an easement for the purpose of clearing a pathway for aircraft is described, yet it is obvious from the altitudes of flight indicated that the taking is a fee-simple condemnation instead of the estate set out in the complaint; and (4) that the amount of damages paid into the court is obviously inadequate.

The government then filed a motion to strike the answer. The matter was argued. On March 5, 1956 this court entered an order setting aside the declaration of taking, removing the possession of the land from the government and directing that the declaration of taking and the complaint be amended to describe accurately, clearly and concisely the character and extent of the estate or interest in defendant's lands taken for public use.

On May 3, 1956 the government filed an amended declaration of taking and amendment No. 1 to the complaint. The defendant then filed an answer to the amended complaint, praying for the dismissal of the complaint and the setting aside of the declaration of taking, both for the reason that the estate or interest taken is not described accurately, clearly and concisely, and, also, for the reason that the United States cannot condemn runway clearance rights without also condemning the right to use the space thus cleared for the flight of aircraft.

The matter has again been argued and briefs submitted. It is noticed that the Rules of Civil Procedure, 28 U.S.C. now apply to the condemnation of property by the United States. Rule 71A requires that the complaint shall contain a short

and plain statement of the authority of the taking, the use for which the property is to be taken, a description of the property sufficient for its identification, the interests to be acquired, etc. The requirements as to what the declaration of taking shall state are substantially the same. 40 U.S.C.A. § 258a. In amending the complaint and declaration of taking the government simply added to each an exhibit, "Schedule 'B' (Supplement)," prepared by the Corps of Engineers, United States Army, and entitled "Greater Pittsburgh Airport West Approach Zone to Runway No. 10, Profile and Plan, (Topographic Map)." However, paragraph III of the amended complaint is novel in that it recites a determination by the Under Secretary of the Air Force. The paragraph in full reads:

"That is has now been determined by James H. Douglas, Under Secretary of the Air Force of the United States to be in the best interest of the United States that 'Schedule "B" Supplement', a topographic map showing thereon at certain intervals the elevations of the glide angle plane and transitional planes with relation to the elevations of the ground level and further depicting thereon the profile along the extended center line of the runway with obstructions that extend into the glide angle plane and transitional planes, be incorporated in the Complaint."

Specifically the amended complaint in paragraph IV recites that other than above-mentioned the complaint as originally filed shall remain in full force and effect.

The point to the amendment of the complaint and declaration of taking is that the government adheres to the proposition that it is only taking a clearance easement in certain airspace over defendant's land. The reason why it condemns the airspace is not stated except that the government says, paragraph 1(b) of the declaration of taking:

"(b) The public uses for which said land is taken are as follows: Said land is necessary adequately to provide for the runway clearances at the Greater Pittsburgh Airport for the use of the Department of the Air Force and for other military uses incident thereto. Said land has been selected under the direction of the Secretary of the Air Force for acquisition by the United States for use in connection with the Greater Pittsburgh Airport, Pennsylvania, and for such other uses as may be authorized by Congress or by Executive Order."

In the declaration of taking, the estate taken is said to consist of the continuing perpetual right to cut to ground level and to remove trees, bushes, shrubs or any other perennial growth or undergrowth infringing upon or extending to a height within 10 feet of the glide angle plane and/or transitional planes described in an attached schedule and to cut to ground level, remove and prohibit any such growth which could in the future infringe upon or extend into or above said planes, the right to remove, raze or destroy those portions of buildings, other structures or land infringing upon or extending into or above said planes and the right to prohibit the future construction of buildings or other structures infringing upon or extending into or above said planes, and the right of ingress to and egress from and passage on and over said tract to effect and maintain said clearances. The glide angle plane therein referred to is described as a trapezoidal plane beginning at the level of said runway at a point on the prolongation of the center line of the main east-west runway 1,000 feet west of the end of the runway and sloping upward at a rate of 1 foot vertically for each 50 feet horizontally for a width of 1,500 feet at the place of beginning, a length of about 10,000 feet and a width of 4,000 feet at the westerly end. The transitional planes therein referred to extend upward and outward, from the boundaries, one on each side, of the glide angle plane,

at a rate of 1 foot vertically for each 7 feet horizontally, measured at right angles to the center line of the main east-west runway, and are triangular in shape. The base of each is 750 feet long and is a prolongation of the easterly boundary of the glide angle plane and the sides are about 5,300 feet long.

The amendments filed by the plaintiff added to the complaint and the declaration of taking a topographic map, marked "Schedule 'B' (Supplement)," showing the contours of the surface of the defendant's lands, a profile of the surface at the prolonged center line of the runway, large clumps of trees, both in plan and profile, and superimposed thereon, the glide angle plane and the transitional planes. As appears from this map, the topography of the defendant's land is such that, at the point closest to the end of the runway, the glide angle plane would be only about 16 feet above the level of the ground. To the north of this point the ground rises until, at a point along the boundary about 600 feet north of the center line of the runway prolonged, the glide angle plane is at ground level. To the west of this point the ground rises until at its highest point it intrudes more than 5 feet above the glide angle plane. It further appears from the map, Schedule "B" (Supplement), that trees now standing on the defendant's land intrude above the glide angle plane for a horizontal distance of about 1,200 feet westwardly from the boundary common to the airport, some by as much as 70 feet above the clearance line.

■ It is the view of this court that the complaint and declaration of taking are not in compliance with the requirements of Rule 71A and 40 U.S.C.A. § 258a. The first requirement in both the statute and the rule is a statement of the authority for the taking. The next requirement is a statement of the public use for which the lands are taken. Equally important also is a statement of the estate or interest in said lands taken for public use. The complaint will be dismissed and the declaration of taking

set aside because they are deficient in not showing the authority for the taking as well as not sufficiently describing the public use or the estate or interest in the land taken. This court is not entirely in accord with all of the reasons advanced by defendant for dismissal. It is believed, however, that the court's reasons, requiring the entry of the order of dismissal, are substantially in accord with the objections raised by defendant.

■ In the first place, my view is in accord with that of Judge Hartshorne of this district expressed in United States v. 29.40 Acres of Land, D.C., 131 F.Supp. 84, at page 86:

"But 'the power of eminent domain is not dependent upon any specific grant (in the United States Constitution); it is an attribute of sovereignty, limited and conditioned by the just compensation clause of the Fifth Amendment.' Hanson Lumber Co. v. United States, 1923, 261 U.S. 581, 587, 43 S.Ct. 442, 444, 67 L.Ed. 809 (parentheses the Court's). The policy to be followed in exercising this implicit governmental power has been delineated many times by the policy-making branch of the Government, the Congress."

■ However, as is stated in United States v. Rauers, D.C., 70 F. 748:

"A fundamental principle of law controlling all matters of this character is that every statute which undertakes to appropriate in any manner the property of private persons for public use, must be strictly construed. One of the great aims of government is to secure to each citizen the enjoyment of his estate. On the other hand, in cases of public necessity, the right of the individual must yield to the right and demand of the public; but, since that demand is in derogation of private right, it must be closely scrutinized, and the expression of legislative purpose in which it is conveyed, must be strictly construed."

Also, in United States v. A Certain Tract of Land, C.C., 70 F. 940, at page 942, the court says:

" * * * The power referred to is, however, not exercisable at all in the absence of legislative authorization. * * * "

And further, at page 943:

"* * * The power of eminent domain is an inherent and essential attribute of sovereignty, but it is arbitrary in character, and is subversive of the right of private property wherever it is resorted to. Therefore, before it can be exercised by any officer of the government, its delegation to him must plainly appear, and may not be deduced from ambiguous language by doubtful inference. * * * "

Also in this connection, Mr. Justice Reed in his concurring opinion, United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 556, 557, 66 S. Ct. 715, 720, 90 L.Ed. 843, said:

"This taking is for a public purpose but whether it is or is not is a judicial question. Of course, the legislative or administrative determination has great weight but the constitutional doctrine of the Separation of Powers would be unduly restricted if an administrative agency could invoke a so-called political power so as to immunize its action against judicial examination in contests between the agency and the citizen. The former cases go no further than this. [Citing cases.]"

In applying the general principles mentioned to the pleadings in this case the query may be posed as to where is the authority to condemn the clearance easement which the government seeks in this proceeding. Government counsel at argument and in its brief lays stress upon a decision of the district court, Northern District of Texas, Fort Worth Division, United States v. 4.43 Acres of Land, etc., 137 F.Supp. 567, decided in January of this year. It is noticed, however, that in the decision cited the ob-

jections raised here were not before the court. Further, the case related to an easement extending outward from the ends of certain airport runways at Carswell Air Force Base and overlying private property. It is well known that the air base named is a government air base of huge magnitude. In that case the government took the same rights it seeks to condemn in the case at bar, but, as is undoubtedly the fact, the air force operates government planes in and out of Carswell Air Force Base. The government in its sovereign power, owning the installation and operating aircraft from it, would certainly be authorized to take over whatever easements were necessary to fulfill its requirements.

In the case before this court, what is the ownership or interest the government already has in the Greater Pittsburgh Airport? The complaint and declaration of taking are silent on this point. Litigation relating to the Greater Pittsburgh Airport has recently been before the Supreme Court of Pennsylvania. A quotation from that court in Gardner v. Allegheny County, 382 Pa. 88, 114 A.2d 491, in which the decision was written May 23, 1955, is interesting and pertinent here. The language, 382 Pa. at page 91, 114 A.2d at page 493 is:

" * * * The airport, which was erected and is owned and maintained by the County of Allegheny, has been used since June, 1952 as a commercial air terminal by virtue of leases of its facilities to the air lines which are co-defendants."

The only reference to the government's activity or interest in the airport appears in what is called "Tract Register of Acquisition After 1 July 1940 (Military)," on Schedule "B" attached to the original declaration of taking. In the upper left-hand corner of this exhibit is an indication that the landowner is the County of Allegheny, Pennsylvania. The notation is that the government has a lease on 1,128.57 acres as of the date of May 4, 1944. The complaint indicates that the easement sought is perpetual as to duration, but nowhere in the complaint

is there any indication of the terms of the government lease. The court has no way of knowing the terms or the length of the government lease, but it can take judicial knowledge of the fact that the newspapers in this area have reported publicly the possibility that the Commissioners of Allegheny County may soon terminate the government lease on the Greater Pittsburgh Airport.

In the judicial examination of the authority asserted by the government in this case, the statutes cited in both the declaration of taking and in the complaint are as follows:

The Act of Congress approved August 1, 1888, 25 Stat. 357, 40 U.S.C.A. § 257, permits the institution of condemnation proceedings when an officer of the Government is authorized to procure real estate for public purposes, but it is not an independent grant of the power of condemnation. Its application depends upon the existence of other legislation authorizing the condemnation of real estate for public purposes. United States v. Fisk Building, D.C., 99 F.Supp. 592.

The Act of Congress approved August 12, 1935, 49 Stat. 610, 611, 10 U.S.C.A. §§ 1343a, 1343b and 1343c authorizes the Secretary of the Air Force to acquire land for Air Force stations and depots, but, in section 1343b, such acquisitions appear to be limited to estates in fee simple, whereas the interest taken in this proceeding is stated to be a mere easement.

The National Security Act of 1947 approved July 26, 1947, 61 Stat. 495, 5 U.S.C.A. §§ 171 et seq., 626 et seq., 50 U.S.C.A. § 401 et seq., sets up the Department of the Air Force and transfers certain functions to it but does not contain any authority to condemn any interests in land.

The Act of Congress approved July 27, 1954, Public Law 534, 83rd Congress, 68 Stat. 535, appropriates funds, *inter alia*, for land acquisition at the Greater Pittsburgh Airport. But the Act further provides in § 501(b) of Title V that:

"No real estate not in Federal ownership shall be acquired by a military department except as such acquisition is or shall be expressly authorized by law: * * *."

Therefore, some other statute must be depended upon for the authorization to condemn the interest sought in this proceeding.

The Declaration of Taking Act of February 26, 1931, 46 Stat. 1421, 40 U.S.C.A. § 258a, is an act which merely prescribes the procedure in condemnation cases where it is desired that title vest in the United States upon commencement of the proceedings. It does not provide any separate authority to condemn.

The only other statute cited by the government as authorizing the taking in the case at bar is the Act of August 18, 1890, as amended, 40 Stat. 518, 50 U.S.C.A. § 171. This statute provides that condemnation proceedings may be instituted for lands or interests therein "needed for the site, location, construction, or prosecution of works for fortifications, coast defenses, military training camps, and for the construction and operation of plants for the production of nitrate and other compounds and the manufacture of explosives and other munitions of war and for the development and transmission of power for the operations of such plants; * * *."

It is apparent that this statute does not confer the authority to condemn the clearance easement sought to be taken in the case at bar, for the reason that a mere easement to remove flight hazards, unaccompanied by the right to fly aircraft through the space thus cleared, could not be used, and therefore cannot be "needed for * * * coast defenses, military training camps * * *" or any other purposes authorized by the statute.

Regardless of the scope of the power in the United States, inherent in its sovereignty, to condemn private property for public use, the case at bar is one where the power is sought to be exercised by the Secretary of the Air Force, an official in the executive branch of the

government. He may exercise this sovereign power only when explicitly authorized by statute, and if Congress has not delegated authority to him by the explicit terms of some statute the proceedings should be dismissed.

"* * * The power of eminent domain is a sovereign power. It does not follow because the United States may exercise it that an executive officer may do so. Before lands can be taken from the possession of their owner it must appear not merely that the Executive has taken them by condemnation, but also that Congress has sanctioned the taking by authorizing it." United States v. 458.95 Acres of Land, D.C.E.D.Pa., 22 F.Supp. 1017, 1019.

In connection with the discussion as to the authority of the government it is to be kept in mind that in this instance the government emphasizes military purposes. Had the government sought to condemn a clearance easement for other than military purposes the proceeding would be controlled by the provisions of the Civil Aeronautics Act of 1938, as amended, 49 U.S.C.A. § 401 et seq., specifically Section 452(c), which provides in part:

"The Administrator, on behalf of the United States, is authorized, where appropriate to carry out this section, * * * to acquire by purchase, condemnation, lease, or otherwise, real property or interests therein, including, in the case of air-navigation facilities (including airports) owned by the United States and operated under the direction of the Administrator, easements through or other interests in airspace immediately adjacent thereto and needed in connection therewith; * * *. Any such acquisition by condemnation may be made in accordance with the provisions of sections 257–258e of Title 40, or any other applicable Act of Congress: *Provided,* That in the case of condemnations of easements through or other interests in airspace, in fixing condemnation awards, consideration may be given to the reasonable probable future use of the underlying land."

It is thus apparent that under the foregoing statute to condemn an easement in airspace needed "in connection therewith" refers to the adjoining airport or air base. This court can see no authority whereby the government can condemn an easement in airspace for military purposes over private land in a helter-skelter fashion, so to speak. Such an easement must be attached to a government installation. In the case before me, the pleadings negative any ownership of the Greater Pittsburgh Airport in the government, except the minute reference to a government lease of some kind. For instance, there is no statement whatsoever that in order to further "military purposes" the government is flying Air Force planes in and out of this airport. The airport in question is predominantly commercial in character. If the government has a military or Air Force installation situated upon it, it should say so and say so clearly so that the landowner here can understand what he may expect over his property.

In the state court litigation, Gardner v. Allegheny County, supra, the Civil Aeronautics Board and Administrator of Civil Aeronautics filed a brief as amici curiae. Of course, the Administrator of Civil Aeronautics cannot bind the Secretary of the Air Force. The brief, however, reveals in many respects the position of the government with regard to civil aviation. For instance, at argument and in the briefs, both sides have referred to United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206. The Causby case held:

"* * * that the owner of land might recover for a taking by national use of navigable air space, resulting in destruction in whole or in part of the usefulness of the land property." See Braniff Airways, Inc., v. Nebraska State Board, 347 U.S. 590, 596, 74 S.Ct. 757, at page 761, 98 L.Ed. 967.

A portion of the government brief, as mentioned, page 15, is noted in the margin.[1]

In the same brief, page 19, note 24, appears the following:

"[24] The intent of Congress that landowners should be compensated where the effect of flight would amount to a 'taking' of their property also appears from Section 302 (c) of the Civil Aeronautics Act, 49 U.S.C. 452(c), which authorizes acquisition of easements in airspace needed in connection with federally owned airports."

■ 49 U.S.C.A. § 452(c) permits then, the acquisition of easements in airspace needed in connection with federally owned airports. By analogy the same rule should apply to easements in airspace needed in connection with a military base. Unquestionably the government, as to federally owned military air

force bases, would have the same right to acquire easements in airspace under the general sovereignty powers of the government, but it certainly must be the law that without the air base the right to an airspace easement cannot be acquired unless Congress has specifically authorized it. Such an authorization has not been pointed out here.

As a general proposition defendant makes a further contention that the clearance easement is an appurtenant easement and that it cannot stand by itself. Defendant says that for an appurtenant easement to exist there must be both a dominant and servient tenement. Such an easement has been described by the Supreme Court of Pennsylvania in Lindemuth v. Safe Harbor Water Power Corp., 309 Pa. 58, 64, 65, 163 A. 159, 161, 89 A.L.R. 1180, as follows:

"* * * 'An appurtenant easement is an incorporeal right which,

1. "[19] An erroneous notion frequently encountered is that the Board or Administrator has 'approved' a certain 'glide path' at some angle from the end of the runways in order to define the lower limits of 'navigable airspace,' and more particularly that such approval is expressed in the Administrator's Technical Standard Order N 18 (TSO–N18). In fact, nothing of this sort would be useful or has even been done. TSO–N18 does not regulate flight but merely establishes the most desirable standards for obstruction-free approaches to airports, and many airports are in use the approaches of which are not free from such 'obstructions.' Some of these standards are expressed in terms of 'imaginary surfaces' at various heights and angles. Objects protruding above these surfaces are *prima facie* obstructions, though upon further inquiry or upon their being marked and lighted they may be found unobjectionable in a particular case. Aircraft, of course, are not authorized or expected to fly along those imaginary surfaces. On the contrary, the standards are so calculated that between them and the expected actual flight path of aircraft pursuant to the Board's regulations there remains an ample cushion or buffer which will insure safety by allowing a reasonable margin or error. The plaintiffs in this case, therefore, are in error in so far as they attempt to conclude upon actual altitude of flight from the 1:40 angle of certain imaginary surfaces described in TSO–N18.

"In U[nited] S[tates] v. Causby, 328 U.S. 256, 258, 264 [66 S.Ct. 1062, 1064, 1067, 90 L.Ed. 1206], the Supreme Court referred to a 'safe glide angle' which it equated with a 'path of glide' approved by the Civil Aeronautics Authority. An examination of the Record and briefs filed with the Supreme Court disclosed that this remark was based on a finding of fact by the Court of Claims (Finding 9, R. 8) which was contrary at least to the clear testimony of a witness, Commanding Officer La Croix, who correctly stated that a 30:1 angle was a clear-approach minimum desired by the Administrator and said (R. 133):

" 'There is a glide path which has absolutely nothing to do with the angle. The glide path is a path which the airplane makes through the air. The glide angle is an angle of obstruction relative to the runway.'

It *is clear, therefore,* that there was a misunderstanding and that the Administrator's obstruction clearance standard of 30:1 as then in force was confused with a path of actual flight. The Supreme Court, of course, was correct in not giving any effect to that angle in determining the boundaries of 'navigable airspace.' "

as the term implies, is attached to and belongs with some greater or superior right—something annexed to another thing more worthy, and which passes as incident to it. It is incapable of existence separate and apart from the particular land to which it is annexed. It is obvious that the easement, to be appurtenant, must be attached to the dominant estate, and it can become legally attached only by unity of title in the same person to both the dominant estate and the easement claimed. In determining whether a particular easement created by grant is or is not appurtenant to land, two matters must be considered—the nature of the right and the intention of the parties. * * *' "

In the application of the foregoing principles to the issue here, the dominant estate or superior right in the government has not been shown in the complaint or the declaration of taking.

In Judge Hartshorne's case, United States v. 29.40 Acres of Land, supra, he was confronted with a somewhat similar problem. It is to be observed, however, that he says, 131 F.Supp. at page 87, in part:

"* * * for the purpose of transmitting electronic impulses for military use, the United States Government took the right to use, and keep clear of physical obstructions from the ground below, an air space starting at its lowest level 50 feet above defendants' land. But the right to use the lands themselves was left to the defendants, subject to such restriction." (Emphasis supplied.)

In the New Jersey case then, the easement was in connection with transmitting electronic impulses for military use. The purpose was clearly stated. The dominant or superior right was the transmitting of the electronic impulses for military purposes. The appurtenant airspace easement was needed and attached to the dominant purpose, that is,

the transmission of the impulses. It is believed that the defendant's position with regard to the clearance easement being an appurtenant easement is correct. There is no dominant tenement and therefore there can be no servient tenement.

Further, as this court understands the government's position, it seeks in this proceeding to disassociate the clearance easement from the flight of aircraft over defendant's property. Defendant owns 271 acres of land lying west of the Greater Pittsburgh Airport. The center line of the main east-west runway, that is Runway No. 10, if extended would cross defendant's land. The end of the runway is approximately 1,700 feet east of the nearest point on the easterly property line of the defendant. Defendant says his land is now and has heretofore been protected to a considerable degree, from the destruction of value which would inevitably result from numerous flights of aircraft over it at low altitudes by a stand of tall trees lying along the easterly boundary on both sides of the center line of the main east-west runway prolonged across defendant's land, and by a hill near the easterly boundary, a few hundred feet north of that line. The trees extend southwardly, from the center line prolonged, about 900 feet, as far as the land described as taken goes, northwardly about 400 feet from the center line prolonged, and westwardly from the easterly boundary about 1,500 feet. The top of the hill is about 42 feet above the level of the runway. The treetops extend as much as 80 feet above ground level and 70 feet above the level of the runway. The 64 acres over which the government seeks to impose the clearance easement is roughly the easterly portion of the north half of the 271-acre tract. The profile and plan, Schedule "B", are of course revealing. It locates the glide angle plane with relation to defendant's property. The glide angle plane is defined as a trapezoidal plane extending over the runway approach zone, starting at an elevation equivalent to the center

line elevation at the end of the runway and sloping upward from the narrower end at a rate of 1 foot vertically for each 50 feet horizontally. From the plan it thus appears that the east end of the glide angle plane commences at the end of the runway at ground level. Where the glide angle plane first crosses defendant's 64-acre tract, it is approximately 16 feet above ground level, that is, at a point on the center line of the runway as prolonged westerly. The glide angle plane, of course, slopes upward at the rate of 1 foot vertically for each 50 feet horizontally. Defendant's ground slopes upward to about halfway across the 64-acre tract and then slopes downward so that at the western boundary the glide angle plane is approximately 100 feet from ground level. The glide angle plane extends over the runway approach zone. The runway approach zone is over the whole of defendant's 64-acre parcel of land.

The government in its brief says the glide angle plane does not necessarily represent the line of flight of aircraft, but is the minimum elevation of the approach zone, including allowance of a safety factor. Therefore, the government says planes may never actually go across defendant's land or may never fly at such low altitudes as to result in direct and immediate interference with the use and enjoyment of his property. The government contends that the taking of the right to clear defendant's land up to a certain height is not the imposition of a flight easement and that is the only right taken in this proceeding by the determination of the only person authorized to make that decision, i. e., the Secretary of the Air Force.

It is rather strange language to designate what is taken here as a clearance easement only. It appears that the easement imposed has many of the attributes of appropriation of a fee. For instance, the plan shows some 16 large trees which are to be removed. The area in which the ground lies is uneven and the contour plan shows the land to be hilly. The northeasterly portion of the 64 acres is the area where in some places the ground extends into the glide angle plane so that the earth must be removed, and the ground generally leveled off.

It is thus apparent that the easement sought has as many attributes of the appropriation of the fee as it does an appropriation of airspace alone. Certainly Rule 71A has not been complied with, as there is no short and plain statement of the interest to be acquired. The area sought is in a sense an appropriation of the fee. This is so because trees and earth are taken and the immediate airspace above the land. There is very little space left on and above the east portion of the tract. Opposite the runway the glide angle plane is 16 feet from the ground. North of this point, however, it is at ground level at various points and at some points below ground level. The government asserts that the airspace sought is not for the flight of aircraft, as the glide angle is an angle of obstruction relative to the runway, and the area sought is simply a cushion or buffer zone, which insures safety to aircraft by allowing the pilot a reasonable margin of error. A property owner should have the same rights even though taken for a military purpose that a property owner has if taken for a civil purpose, that is, in condemnation of easements through or other interests in airspace, in fixing condemnation awards, consideration should be given to the reasonable probable future use of the underlying land. 49 U.S.C.A. § 452(c).

The conclusion is that not only is no authority shown for the taking, but there is no plain statement of the public use for which the lands sought are taken, nor is there a clear and adequate statement of the estate in the lands taken for public use.

An order of dismissal will be entered.